**SO ORDERED.**

**SIGNED this 31 day of March, 2019.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:  CASE NO. 14-07105-5-DMW

**JAMES ALEXANDER MASON, JR.**

CHAPTER 7

**DEBTOR**

### MEMORANDUM OPINION AND ORDER SUSTAINING OBJECTION TO CLAIM

This matter comes on to be heard upon the Trustee's Motion for Summary Judgment filed by Richard D. Sparkman, Esq. ("Trustee"), Chapter 7 trustee in the matter of James Alexander Mason, Jr. ("Debtor"), on July 23, 2018 and the Response to Trustee's Motion for Summary Judgment and Brief in Support by Scott Landress filed by Scott Landress ("Landress") on October 12, 2018. The court conducted a hearing in Raleigh, North Carolina on November 5, 2018. James B. Angell, Esq. appeared for the Trustee, and George M. Oliver, Esq. appeared for Landress. Based upon the pleadings and the affidavits and answers to interrogatories and admissions filed with the court, the court makes the following findings of fact and conclusions of law:

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The court has the authority to hear this matter

pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

BACKGROUND

The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on December 8, 2014. The court appointed the Trustee as Chapter 11 trustee on August 28, 2015. On April 25, 2016, upon motion of the Trustee, the court converted the case to a case under Chapter 7 and appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 704.

The Debtor was one of three managing partners of MMJ Partners, LLP ("MMJ"), formerly known as Parish Capital Advisors, LLP from April 2, 2012 until this case converted to a Chapter 7 proceeding. Charles E. Merritt ("Merritt") and David Jeffrey ("Jeffrey") are the remaining two managing partners of MMJ. MMJ is a Delaware limited liability partnership with its principal business office in Durham, North Carolina. MMJ filed a Statement of Qualification with the Delaware Secretary of State[1] on May 18, 2006 under its former name of Parish Capital Advisors, LLP and updated its name to MMJ with a Certificate of Amendment filed with the Delaware Secretary of State on April 5, 2012. The MMJ Partnership Agreement ("Partnership Agreement") states that it "shall be construed and interpreted in accordance with the laws of the State of Delaware." According to Merritt, MMJ manages investments in other entities and "invests money for the purpose of earning a profit from the efforts of others." Neither the Trustee or Landress presented evidence that MMJ is not in good standing with the Delaware Secretary of State.

When the Debtor filed his bankruptcy petition, he owned a fifteen percent interest in Tier One Solar, LLC ("TOS"). On December 23, 2013, TOS borrowed the amount of $850,000.00 from Mutsy I, LLC ("Mutsy") pursuant to a Secured Convertible Promissory Note ("Note").

---

[1] *See* 6 Del. C. § 15-1001 (2005).

2

Mutsy is wholly owned and managed by Landress. On December 23, 2013, Mutsy advanced the amount of $820,000.00[2] to TOS.

In conjunction with the loan from Mutsy to TOS, the Debtor executed a Personal Guaranty[3] and a Security Agreement, both dated December 23, 2013. The Security Agreement purported to grant to Mutsy a security interest in "(a) all right, title and interest of [the Debtor] in, to and under the MMJ Partnership Agreement and the partnership interests owned by [the Debtor] in MMJ; (b) all dividends and distributions payable in respect of such partnership interests and (c) all proceeds of the foregoing" to secure payment of the Note. The Security Agreement states that it "shall be governed by and construed in accordance with the laws of the State of New York without reference to conflicts of law rules . . . ."

> The Security Agreement states that
>
> [The Debtor] is the owner of the Collateral (or, in the case of after-acquired Collateral, at the time [the Debtor] acquires rights in the Collateral, will be the owner thereof) and that no other Person has (or in the case of after-acquired Collateral, at the time the [Debtor] acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than Permitted Liens; . . .
>
> [T]he execution . . . of this Agreement, and the performance and consummation of the transactions contemplated hereby, do not and will not violate any provision of, or result in the breach . . . of . . . any material contract to which [the Debtor] is a party or by which [the Debtor] is bound;
>
> [N]o consent, approval, . . . or authorization of . . . any . . . other person or entity (including, without limitation, the shareholders of any entity) is required in connection with the execution and delivery of this Agreement and the performance and consummation of the transactions contemplated hereby, other than as have been obtained or made; [and]

---

[2] This amount was stated in the Debtor's Affidavit filed by the Trustee and in the Trustee's Motion for Summary Judgment.

[3] A copy of the Guaranty is attached to the Proof of Claim filed by Landress and described in further detail *infra*.

> [The Debtor] hereby agrees (a) to perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to Secured Party therein and the perfection of such Lien . . . .

Landress, a resident of California, was in Florida when the attorney-in-fact for Mutsy executed the Security Agreement in New York. Neither Landress nor the Debtor resides in New York, but the Debtor, a resident of North Carolina, was in New York on vacation with his children when he signed the Security Agreement.

The Debtor did not provide Landress or Mutsy with a copy of the Partnership Agreement prior to the closing of the loan. The Partnership Agreement defines a "Partnership Interest" as all of a partner's interests in MMJ, including the economic interest (the right to distributions) and management rights. Net profits, as defined by the Partnership Agreement, are distributed to partners' capital accounts, and transferees of partnership interests succeed to the capital account if a transfer of an interest is made in accordance with the terms of the Partnership Agreement. The Partnership Agreement further limits distribution rights to "Persons shown in the Required Records to be Partners on the actual date of distribution."

The definition of a "transfer" within the Partnership Agreement includes an "attempt to create or grant a security interest." The Partnership Agreement states that "[a]ny Transfer or purported Transfer of a Partnership Interest shall be null and void unless made strictly in accordance with the terms and conditions of [the Partnership Agreement] . . . . [N]o Partner or other holder of a Partnership Interest may pledge or hypothecate its Partnership Interest to secure a debt or other obligation of any Person without the consent of the Board." The "Board" is defined within the Partnership Agreement as "a group comprising all Managing Partners," and if one partner has a direct or indirect interest in a matter, the remaining, disinterested managing partners must make whatever determination is before the Board.

Except for transfers permitted under the Partnership Agreement provisions governing transfers upon incapacity or death and transfers to a partner's control affiliate,

> a Person holding a Partnership Interest may Transfer his Partnership Interest, or any part thereof, only pursuant to a written, bona fide offer to purchase such Partnership Interest solely for cash . . . and only if such Partner . . . prior to acceptance of such Third Party Offer, delivers a written offer . . . to sell the . . . Partnership Interest . . . to each of the Managing Partners . . . .

The Partnership Agreement also states that

> Any Transfer of a Partnership Interest to a Person that is not a Partner prior to such Transfer shall be effective to give the Transferee only the right to receive the allocations of Net Profits and Net Losses and distributions to which the Transferor would have been entitled if the Transfer had not been made, and shall not be effective to admit the Transferee as a Partner. *The Partnership need not give effect to a Transferee's rights under this Section 12.4(a) until it has notice of the Transfer and, if the Partnership requests, reasonable proof of the Transfer.* (emphasis added).

According to Merritt's affidavit, the Partnership Agreement's restrictions on transfers of partnership interests in MMJ are in place because of the following factors:

1. The Partnership Agreement deems confidential certain commercially valuable information about affiliate entities; and

2. The Partnership Agreement requires partners to make certain capital contributions to MMJ.

Merritt asserts "[i]t would be detrimental to the other Partners in the Partnership if a Partner were unable to fund a capital contribution." It would follow that if a partner could unilaterally grant a lien on distributions, then that partner's ability to fund capital contributions could also be compromised. A partnership agreement that fails to recognize these potential problems may be woefully inadequate to protect the longevity of that partnership.

The Trustee states as an undisputed fact that Mutsy was unaware of the restriction on the transfer of the Debtor's interest in MMJ when the Debtor signed the Security Agreement. In his

5

affidavit, the Debtor asserts that he told Landress on December 23, 2013 (the date of the closing) that the pledge of his interest in MMJ was subject to the consent of the other partners of MMJ.[4] On January 14, 2014, Landress emailed the Debtor and requested a copy of the signed Partnership Agreement. On February 14, 2014, Landress again requested the signed Partnership Agreement and requested the "consent [of the other partners to the terms of the Security Agreement] – per consent plan we agreed you would follow."

The Note had an initial maturity date of April 30, 2014. On April 16, 2014, an attorney for Landress sent to the Debtor a proposed "Allonge" meant to incorporate into the Security Agreement "MMJ and its partners' approval of the pledge of collateral and . . . an executed copy of the MMJ Partnership Agreement . . . ." In May of 2014, another attorney for Landress sent an email to the Debtor requesting "true, accurate and complete copies of all documents that reflect[ed] the Debtor's] interests in MMJ and all other entities. That attorney also requested "the name, phone number, and an email address for every MMJ partner and every other interested party . . . ." Landress again asked the Debtor for a copy of the Partnership Agreement on September 9, 2014 and also requested an "accounting of all income to and distributions from the MMJ Partnership to the partners that occurred in 2013 and 2014."

The Debtor informed Landress on September 11, 2014 that he could not "pledge MMJ." The Debtor emailed the Partnership Agreement to Landress on September 30, 2014. Sometime after the Debtor filed his bankruptcy petition, Landress also sent a text message to the Debtor stating "Just so we're clear, I funded on your assurance that you'd get the MMJ consents

---

[4] These two statements appear to conflict and would preclude the Trustee's success on one of his asserted grounds for summary judgment, that it is undisputed the parties "had an express agreement that the Security Agreement would not be effective until the partners of MMJ consented to the transfer;" however, as discussed *infra*, the court is granting summary judgment on other grounds, so the court does not need to address this apparent inconsistency.

6

immediately after closing. No brainer was your term. I don't recall that changing until, a good while later, you told me they declined."

Neither Merritt nor Jeffrey consented to the Debtor's pledging his interest in MMJ, as collateral for a loan or otherwise, either before the Debtor filed his bankruptcy petition on December 8, 2014, or post-petition.

At some point, Landress executed a Secured Convertible Promissory Note Assignment Agreement and Notice transferring Mutsy's interest in the Note to Landress, with an effective date of December 23, 2014.[5] It appears from Landress' responses to the Trustee's request for production of documents that Landress may have filed a financing statement to perfect his purported lien on the Debtor's interest in MMJ.[6] Landress filed Proof of Claim 29-1 ("Claim") on August 1, 2016, asserting a secured claim in the amount of $1,275,000.00 based on the Note and Security Agreement.

The Trustee filed an Objection to the Claim on December 13, 2016, asserting various grounds for disallowance of the Claim, including that the Partnership Agreement "states that [the Debtor] cannot pledge or assign his partnership interest without unanimous consent of other MMJ partners, which did not occur."[7]

Landress filed a Response to the Objection on February 16, 2017, asserting that New York law, which is identified in the Security Agreement as governing law, "serves to override contractual restrictions on assignment and pledges in an agreement between an account debtor

---

[5] The document states an effective date of December 23, 2014; however, in his Response to the Trustee's Objection to his claim, Landress asserts the assignment was effective as of December 23, 2013. It is more likely that Landress meant December 23, 2013. Regardless, Landress is the assignee of the Note for determining the present issue before the court.

[6] The question of whether Landress properly perfected a lien on the Debtor's interest in MMJ is not relevant to the matter currently before the court, because the court finds that the Debtor did not successfully pledge his interest in MMJ or any related distributions pursuant to the Security Agreement, and Landress had no lien to perfect.

[7] The Trustee also challenged Landress as the proper creditor, asserting that no valid assignment of Mutsy's interest in the Note had occurred. That issue is not before the court at this time.

7

(including a partnership) and assignor (including a partner of a partnership)." At the hearing on the Motion, Landress also asserted that North Carolina law that was in effect in December 2013 also overrode contractual restrictions on assignment.[8] Specially, Landress asserts that as of the date of the Note and Security Agreement, the prohibitive terms within the Partnership Agreement did not preclude the Debtor from assigning his interest in MMJ to secure the Note under the North Carolina law in effect at that time.

The parties have treated the Objection as a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure, and the Trustee has engaged in discovery. Landress has had the opportunity to undertake discovery with respect to the Debtor, but he has not conducted that discovery. Pursuant to Rule 9014(c), Rule 7056 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 56 of the Federal Rules of Civil Procedure and governs summary judgment, applies to contested matters.

The Trustee asserts that no genuine issue of material fact exists regarding two grounds for sustaining the Objection. First, the Trustee asserts the undisputed facts show "Mutsy and [the Debtor] had an express agreement that the Security Agreement would not be effective until the partners of MMJ consented to the transfer." Second, the Trustee asserts no genuine issue of material fact exists related to whether the Claim is secured, because the Debtor did not successfully pledge his partnership interest or related distributions as security for payment of the Note.

To support his propositions, the Trustee has filed affidavits from the Debtor and Merritt. The Merritt affidavit includes as an attachment the Partnership Agreement which governed MMJ

---

[8] In 2013, the North Carolina legislature added language to N.C. Gen. Stat. §§ 25-9-406 and 408 which excepted those sections from applying to assignment of an interest in a partnership, effective January 1, 2014. In other words, beginning January 1, 2014, a term in an agreement covered by §§ 25-9-406 and 408 which prohibits or restricts assignment or transfer of, or the creation, attachment, or perfection of a security interest in a payment intangible or general intangible remains effective if the assignment is of an interest in a partnership. Prior to January 1, 2014, restrictions on assignment of an interest in a partnership were arguably ineffective under §§ 25-9-406 and 408, assuming a partnership agreement among partners would qualify as an agreement between a debtor and account debtor.

8

at the time the Debtor executed the Security Agreement. The Trustee also has filed Landress' answers to the Trustee's interrogatories and request for admissions and production of documents. Landress filed an affidavit supporting his position.

## DISCUSSION

Pursuant to Rule 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former version of Fed. R. Civ. P. 56(c)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In addition, a party opposing summary judgment must cite "to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1).

### No Genuine Issue of Material Fact Exists on Whether the Claim is Secured

As noted above, the Trustee asserts no genuine issue of material fact exists related to whether the Claim is secured, because the Debtor did not successfully pledge his partnership interest or related distributions in MMJ as security for payment of the Note. The court must examine whether the Debtor successfully pledged his interest despite the restrictions contained in the Partnership Agreement.

As a starting point to an examination into whether the Debtor's pledge of his interest in MMJ is effective, the court must determine which state's substantive law governs its analysis. "A bankruptcy court may . . . face situations in which the applicable federal law incorporates matters which are the subject of state law. It is clear that a federal court in such cases must apply state law

9

to the underlying substantive state law questions," absent a federal policy interest to the contrary. *In re Merritt Dredging Co.*, 839 F.2d 203, 205 (4th Cir. 1988). Bankruptcy courts should apply their forum states' choice of law principles. *Id.* at 206.

Generally, under North Carolina's adoption of the Uniform Commercial Code ("UCC"), "when a transaction bears a reasonable relation to [North Carolina] and also to another state or nation the parties may agree that the law either of [North Carolina] or of such other state or nation shall govern their rights and duties." N.C. Gen. Stat. § 25-1-301 (2006). Although North Carolina courts generally give effect to contractual choice of law provisions (*see Covenant Equip. Corp. v. Forklift Pro, Inc.*, 2008 NCBC 10, 39 (2008)), in a matter concerning an entity's internal governance, North Carolina employs the "internal affairs doctrine."[9] The internal affairs doctrine "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands." *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680 (2008) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). In those situations, courts look beyond a contract's choice of law provision and "look to the local law of the state of incorporation to determine matters involving a corporation's 'internal affairs.'" *Velleros, Inc. v. Patterson*, 2015 NCBC 15, 37 (2015) (citing *Bluebird Corp.*, 188 N.C. App. at 680-81).

The issue before the court, whether the Claim is secured by the Debtor's partnership interest in MMJ, necessarily implicates the internal governance of MMJ. If the court were to find the Debtor successfully pledged his interest in MMJ as security for the Note, then Landress would have a lien on distributions from MMJ, and under the terms of the Partnership Agreement, the

---

[9] The court notes that New York also recognizes the internal affairs doctrine. *See* NY CLS LLC § 801.

10

distributions are inextricably linked to capital contributions from the MMJ partners. The interest of MMJ in maintaining consistency between the contributors of capital and the recipients of distributions is sufficiently related to the internal affairs of MMJ to require application of the internal affairs doctrine. It is therefore worth briefly examining the result from application of the New York and North Carolina adoptions of the UCC, because if the result were the same no matter which law applied, then the court's application of the internal affairs doctrine would be unnecessary. Assuming the provisions of UCC §§ 9-406 and 9-408, as adopted by and effective in December 2013 in New York and North Carolina, apply to anti-assignment provisions in agreements between partners of a partnership,[10] the following outcomes are possible:

1. If the partnership interest were treated as a payment intangible with no governance rights in MMJ associated with it, § 9-406(d) would invalidate any provision within the Partnership Agreement which "prohibits, restricts, or requires the consent of . . . the account debtor" to "the assignment or transfer of, or the creation, attachment, perfection, or enforcement of a security interest in . . . the payment intangible [partnership interest]." UCC § 9-406. Under a liberal reading of § 9-406, ignoring that the Partnership Agreement requires approval of the managing partners (acting as the board), and not MMJ itself for the creation of a security interest in a partner's interest, application of New York or North Carolina law could conceivably yield the result in the Debtor being able to override the terms of the Partnership Agreement and encumber the economic distributions associated with his partnership interest.

---

[10] The UCC refers to agreements between a debtor and an account debtor regarding the alienability of interests in the agreement, and some courts have assumed this to encompass partnership agreements between partners. Other courts have found that an agreement between partners, even an agreement between limited partners and a general partner, cannot qualify as an agreement between a debtor and an account debtor. *See, e.g.*, *Newcombe v. Sundara*, 274 Ill. App. 3d 590, 596-97 (1995). For purposes of this Opinion, the court need not examine whether those courts have been correct in their analyses, but the court notes that partnership agreements often are not agreements between a debtor (partner) and account debtor (partnership), but instead are agreements between the partners themselves.

11

2. If the partnership interest were treated as a general intangible, meaning the Debtor's governance rights were included, § 9-408 would invalidate any provision within the Partnership Agreement which prohibits the "creation, attachment, or perfection" of a security interest in the partnership interest. UCC § 9-408. Although the secured party (Landress) would not be able to enforce his lien against MMJ, the lien would attach to the partnership interest.

MMJ is a Delaware limited liability partnership. If Delaware law dictates a different result than the potential results under New York or North Carolina law, then this court should apply the laws of Delaware to the matter before it. The court must determine whether the Debtor could successfully pledge his interest in MMJ as security for the Note under Delaware law.

Application of Delaware law to determine the status of the Claim is also consistent with general conflicts of law principles.

> Issues involving the rights and liabilities of a corporation . . . are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties . . . . The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 302 (Am. Law Inst. 1988). Although the parties to the Security Agreement had ties to New York and North Carolina, the purported transfer of the Debtor's interest in MMJ triggers an issue "involving the rights and liabilities of" Merritt, Jeffrey and MMJ, who are not parties to the Security Agreement.

Landress asserts that the court should not apply the laws of Delaware to the conveyance of the purported security interest, because the transactions and interactions related to the Security

12

Agreement have no reasonable relationship to Delaware;[11] however, just as the parties to the Security Agreement have minimal connections to Delaware, the partners of MMJ, other than the Debtor, did not participate in the drafting and execution of the Security Agreement. The internal affairs doctrine prevents parties from side-stepping an entity's governance document by including a choice of law provision for a state other than the state in which the entity is organized. As noted by the Trustee, "Delaware has an interest in enforcing its laws determining the rights, obligations and property interests of members of limited liability partnerships organized and existing under its laws." *See also In re Topps Co. S'holders Litig.*, 924 A.2d 951, 958 (Del. Ch. 2007) ("Corporations are chartered by states, and the managers and investors who form them are free to choose from among a variety of laws to govern their relationships. Their contractual expectations deserve respect. The authority of a state to regulate the internal affairs of the corporations it charters is one of the oldest and most firmly established doctrines in American corporation law.").

The application of Delaware law under the circumstances of this case also appears to be the outcome the drafters of the UCC would predict. Comment 3 of UCC § 9-401[12] states that "it might be inappropriate for a designation of applicable law by a debtor and secured party under Section 1-301['s choice of law provisions] to control the law applicable to an independent transaction or relationship between the debtor and an account debtor." Comment 3 provides the following example:

> State X has adopted this Article; former Article 9 is the law of State Y. A general intangible (e.g., a franchise agreement) between a debtor-franchisee, D, and an account debtor-franchisor, AD, is governed by the law of State Y. D grants to SP a security interest in its rights under the franchise agreement. The franchise agreement contains a term prohibiting D's assignment of its rights under the

---

[11] Of course, Mutsy and TOS were both Delaware limited liability companies, but there is no other connection between the Security Agreement and the state of Delaware.

[12] Section 9-401(a) states "Except as otherwise provided in subsection (b) and Sections 9-406, 9-407, 9-408, and 9-409, whether a debtor's rights in collateral may be voluntarily or involuntarily transferred is governed by law other than this article." UCC § 9-401(a).

13

>agreement. D and SP agree that their secured transaction is governed by the law of State X. Under State X's Section 9-408, the restriction on D's assignment is ineffective to prevent the creation, attachment, or perfection of SP's security interest. State Y's former Section 9-318(4), however, does not address restrictions on the creation of security interests in general intangibles other than general intangibles for money due or to become due. Accordingly, it does not address restrictions on the assignment to SP of D's rights under the franchise agreement. The non-Article-9 law of State Y, which does address restrictions, provides that the prohibition on assignment is effective.
>
>This Article does not provide a specific answer to the question of which State's law applies to the restriction on assignment in the example. However, *assuming that under non-UCC choice-of-law principles the effectiveness of the restriction would be governed by the law of State Y, which governs the franchise agreement, the fact that State X's Article 9 governs the secured transaction between SP and D would not override the otherwise applicable law governing the agreement*.

UCC § 9-401, cmt. 3 (emphasis added).

Alternately recited by the United States District Court for the Eastern District of Pennsylvania, "parties may generally 'agree that the law either of this Commonwealth or [another] state or nation shall govern *their rights and duties*,' [i]t does not provide that parties may bind persons who never agreed to that choice." *In re Eagle Enters.*, 237 B.R. 269, 273-274 (E.D. Pa. 1999) (citation omitted); *see also Fishback Nursery, Inc. v. PNC Bank, N.A.*, No. 3:16-CV-03267-B, 2017 U.S. Dist. LEXIS 207823, at *18 (N.D. Tex. Dec. 19, 2017) ("Courts generally do not enforce choice-of-law provisions against parties who do not agree to them"); Charles W. Mooney, Jr., *Choice-of-law Rules for Secured Transactions: An Interest-Based and Modern Principles-Based Framework for Assessment* 871-72 (2017) (noting that an element to creation of a security right is "that the asset itself be transferable and not be subject to any restriction that would render a purported transfer ineffective. Under the UCC party autonomy approach, it is likely that in many circumstances the law chosen by the assignor and assignee to apply to the secured transaction would not be applied to these elements. The assignor's rights are likely to be derived from a third party in a transaction (for example, in which the assignor bought the asset) that is wholly unrelated

14

to the secured transaction between the assignor and assignee. Similarly, to the extent that the alienability or inalienability of the asset implicates the rights of a third party . . . , assignor-assignee party autonomy likely would not prevail." (citing UCC § 9-401, cmt. 3)). The parties cannot contract around these principles, even with language purporting to choose New York Law "without reference to conflicts of law rules."

Pursuant to Delaware's enactment of the UCC, "[e]xcept as otherwise provided in subsection (b) and Sections 9-406, 9-407, 9-408, and 9-409,[13] whether a debtor's rights in collateral may be voluntarily or involuntarily transferred is governed by law other than this Article." 6 Del. C. § 9-401(a).

Delaware limited partnership law provides that "[u]nless otherwise provided in the partnership agreement[, a] partnership interest is assignable in whole or in part," although "[a]n assignment of a partnership interest does not dissolve a limited partnership or entitle the assignee to become or to exercise any rights or powers of a partner" 6 Del. C. § 17-702(a)(1)-(2) (2007). The Partnership Agreement restricts the assignment of partnership interests in whole or in part, and under Delaware law, the provisions of the Partnership Agreement govern assignability. "A transfer of a partner's economic interest in the partnership in violation of a restriction on transfer contained in a partnership agreement is ineffective." 6 Del. C. § 15-503(f).

An enforceable security interest is dependent upon the debtor having rights in the collateral or the power to transfer rights in the collateral to the secured party. *See* UCC § 9-203(b) (adopted

---

[13] Subsection (b) of § 9-401 relates to agreements "between the debtor and secured party which prohibit[] a transfer of the debtor's rights in collateral" and is not applicable to this matter. 6 Del. C. § 9-401(b) (2000). Sections 9-406 and 9-408 do not apply to interests in a partnership. 6 Del. C. § 9-406(i) (2013); 6 Del. C. § 9-408(e) (2013). Section 9-407 governs the creation or enforcement of security interest in leasehold interest or in lessor's residual interest and is not applicable to this matter. 6 Del. C. § 9-407 (2000). Section 9-409 governs restrictions on assignment of letter-of-credit rights and is not applicable to this matter. 6 Del. C. § 9-409 (2000).

in relevant part by Delaware, New York and North Carolina at 6 Del. C. § 9-203 (2004); NY CLS UCC § 9-203 (2001) and N.C. Gen. Stat. § 25-9-203 (2006), respectively). The Debtor did not have the power to transfer rights in his partnership interest in MMJ when he executed the Security Agreement, and Landress does not have an enforceable security interest in the Debtor's partnership interest. By the terms of the Partnership Agreement, the Debtor's partnership interest includes his economic rights in MMJ. Without an enforceable lien on the Debtor's MMJ partnership interest, Landress cannot have an enforceable interest in the distributions related to the Debtor's interest, either.

While it is unclear whether Landress knew that MMJ's approval of the assignment under the Security Agreement was necessary at the time of the execution of that document, his behavior and the behavior of his agents show a clear and unquestionable desire to obtain the MMJ partners' consent. The constant and persistent requests for the Debtor to obtain consent to the terms of the Security Agreement undermine the position that Landress now asserts.

The court notes that Landress may have a claim against the Debtor related to the Debtor's inaccurate representations within the Security Agreement that he had the ability to grant a lien on his partnership interest and would perform all acts necessary to allow Landress to obtain a perfected lien; however, that matter is not before the court, and the court makes no finding as to whether that claim would be available under applicable statutes of limitation.

The Debtor did not create a valid lien on his interest in MMJ when he executed the Security Agreement, because he did not have assignable rights to pledge. The Trustee's Motion for Summary Judgment should be allowed on those grounds, alleviating the court's consideration of the Trustee's assertion that Mutsy and the Debtor "had an express agreement that the Security Agreement would not be effective until the partners of MMJ consented to the transfer." Through

the granting of summary judgment, the Objection to Claim is sustained, and the Claim should be treated as an unsecured claim in the Debtor's case based on the separate Guaranty document executed by the Debtor in conjunction with the Note; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Motion for Summary Judgment be, and hereby is, allowed;

2. The Objection to Claim be, and hereby is, sustained; and

3. Proof of Claim 29-1 shall be treated as an unsecured claim in the Debtor's case.

END OF DOCUMENT